## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JONATHAN HEDGPETH,

Plaintiff,

v.

AMMAR RAHIM, *et al.*,

Defendants.

Civil Action No. 15-1228 (JEB)

## MEMORANDUM OPINION

This story begins with Plaintiff Jonathan Hedgpeth strewn across the ground outside the Den of Thieves — an inauspiciously named bar in Washington's U Street corridor.  He is bleeding from a gash along his forehead, his memory foggy.  All he knows is that two police officers from the Metropolitan Police Department are now handcuffing his arms behind his back.  After he is restrained, paramedics transport Hedgpeth to a nearby hospital where he stays overnight; he spends the next day in jail before being released without charges.  Hedgpeth would later be diagnosed with memory loss and other post-concussive brain disorders.  Since his police encounter, he has attempted to piece together the events of that night and now believes that in the course of arresting him, the officers used a takedown maneuver and rammed his head into a grated window.  Once he identified those two policemen as Ammar Rahim and Matthew Rider, he filed this suit against them under 42 U.S.C. § 1983 and state common law.

Defendants now seek summary judgment, principally asserting that they are entitled to qualified immunity for acting as reasonable police officers when arresting and using force against Plaintiff, which unfortunately resulted in unintended injuries.  As they saw it, he was a loud, obnoxious, and noncompliant drunk, and they had reason to believe he had been traversing

1

the block, punching strangers.  Hedgpeth counters that he may have been obstinate, but in no way opened himself up to what he believes was an act of gratuitous violence.  He, of course, does not remember any of what happened.  Luckily for the Court, the testimony of multiple eyewitnesses pierces the thick fog of Plaintiff's amnesia.  Faced with a clearer picture now that Defendants did not behave so unreasonably that they could be liable individually for this incident, the Court grants their Motion for Summary Judgment.

## I.     Background

When perusing the record, the Court, as it must, views the evidence in the light most favorable to Plaintiff.  Yet this noble-sounding standard bumps up against the stark reality that a record like this one has certain predictable gaps.  Where a plaintiff's memory ordinarily breathes life into a narrative, alas, this Plaintiff has no recollection.  See ECF No. 37, Exh. 3 (Psychiatric Examination by Dr. Gerald Shiener) at 2.  Fortunately for Hedgpeth, other witnesses were present to observe the events, and the Court credits their testimony where it aids Plaintiff.

On the evening of March 2, 2015, Hedgpeth, a 37-year-old white male, was out and about on U Street in Washington's northwest quadrant.  The evening had been going well so far, as he had been enjoying himself at a local wine tasting.  See Shiener Exam at 1; ECF No. 32, Exh. 5 (Expert Report of Luca Zarwell).  He left that event alone and then stopped by the downstairs bar of Marvin, a neighborhood restaurant he frequented often.  See ECF No. 40, Exh. 14 (Deposition of Tyler Webb) at 10:12-21.  There, he had a few drinks and began engaging with the bartender and other patrons.  Id. at 11:12-16; see Shiener Exam at 1.  Although it was not outwardly obvious whether Hedgpeth was thoroughly intoxicated by that time, the floor manager of Marvin — Tyler Webb — later recalled that he was "being loud and being like aggressive and saying racially inappropriate things," enough so that customers began inching away from him at the bar.

2

See Webb Dep. at 10:21-11:16, 12:15-13:18.   Over the course of thirty to forty-five minutes, one customer complained about his behavior and Webb had to speak with him twice about "keep[ing] his voice down." Id. at 12:3-4, 12:15-13:7, 13:21-14:1.   Perhaps realizing he had become an unwelcome gadfly downstairs, Hedgpeth relocated to Marvin's upstairs club. Id. at 12:4-7.   That proved unsuccessful, as he was swiftly booted from there. Id. at 14:4-6.

Some libertines find sobriety after a stroll in the brisk night air.  But, in this case, two police officers found Hedgpeth first.  Rahim and Rider were in the area attending to a homeless man when they heard a loud voice.  See ECF No. 32, Exh. 1 (Deposition of Ammar Rahim) at 45:15-46:5;  ECF No. 43, Exh. 2 (Deposition of Matthew Rider) at 69:3-20.   It was Hedgpeth. The officers watched him walk toward them, alongside a "tall black male"; Plaintiff pushed him, and the man pushed back.  See Rahim Dep. at 46:2-49:11, 52:2-9.   The man then headed toward the officers, proclaiming: "[H]ey did you see that? This guy just pushed me." Id. at 53:5; see Rider Dep. at 70:15-71:4.   The officers told the tall black gentleman to hold fast and wait, as they would approach his assailant. See Rahim Dep. at 56:9-16.

Hedgpeth, meanwhile, had bumped into a former coworker, Marcus Lee. See ECF No. 37, Exh. 4 (Deposition of Marcus Lee) at 6:4-12.  Lee was then outside the Den of Thieves — an establishment right next door to Marvin — where he had left his sunglasses the prior night. Id. at 8:1-7; Webb Dep. at 7:14-16.  Hedgpeth approached him from behind and gave him a friendly "buddy punch" on the shoulder.  See Lee Dep. at 8:12-13.  Although the two were once coworkers, they had not seen each other for a few years. Id. at 6:4-17.  Naturally, the pair started to catch up — a brief exchange that Lee later gauged as "coherent." Id. at 8:14-16, 65:1.

That reunion was cut short.  Although it is not clear from the record how much time it took for Rahim and Rider to wrap up with the homeless man and pursue Hedgpeth, it apparently

was not long. "All of a sudden," they approached from his rear and began interrogating the pair of friends. Id. at 8:17-19.   The officers stated, "[W]e've got reports of somebody hitting people, up and down the street that we were on." Id. at 10:16-18;  see id. at 9:11-13, 14:14-15, 49:15-17. They expressed curiosity as to where Plaintiff had been that night. Id. at 49:12-13.   Thinking that Hedgpeth was somehow soon to get in trouble for the friendly fist greeting moments earlier, Lee explained, "[N]o, no, he's a friend of mine, we're just talking, it's not what you think." Id. at 9:14-16.   Uninterested, the officers dismissed Lee's suggestion and ushered him to the side, directing their focus on Hedgpeth instead. Id. at 9:13-21.

Yet when they repeatedly asked Hedgpeth for his name, he would not answer them. Id. at 20:4-6, 49:19-20.   Rahim and Rider then broke off and chatted amongst themselves, coming to the conclusion that a different approach was warranted. "Have you been drinking tonight," they probed; "I know you've been drinking." Id. at 14:17-20, 49:20-50.   Plaintiff would not give them an answer to this either. In contrast to his one-on-one with Lee, however, Hedgpeth's demeanor grew less sociable. He began telling the police that "he didn't do anything," speaking in slurred speech and acting like he was drunk. Id. at 71:19-72:1;  see id. at 44:18-20, 75:6-12; Rider Dep. at 169:2-4.   Lee suspected, however — because Hedgpeth covertly winked to the side — that he was "faking" it.  See Lee Dep. at 64:21-65:5, 68:13-69:2, 72:15-73:8.

Was Hedgpeth drunk or simply tipsy?  It's hard to say. Lee testified that Hedgpeth was not wavering or unable to stand up. Id. at 65:17-66:3.  A barely audible cellphone video filmed by Lee during the encounter also shows Plaintiff steady with both feet firmly planted, without any significant teetering movements that one might associate with someone a few sheets to the wind.  See ECF No. 41 (Pre-Arrest Video).  After seven seconds of Hedgpeth's standing there, the video ends. Rahim and Rider recounted, conversely, that he had been trying to (but could

not) keep his balance. <u>See</u> Rahim Dep. at 53:16-18; Rider Dep. at 169:2-5. Defendants' expert, after scanning Plaintiff's later hospital records that recorded his blood-alcohol content, likewise determined that he had the equivalent of <u>fourteen</u> alcoholic beverages in his system at the time. <u>See</u> Zarwell, ¶ 10. Even so, intoxication is tricky: Alcohol affects individuals differently, and even an inebriate can feign sobriety for a short while and *vice versa*.

No matter. If Plaintiff was mimicking a drunkard, he apparently did so all too well. Rider told Lee that they thought Hedgpeth was drunk and asked if Lee would be willing to take his friend home. <u>See</u> Lee Dep. at 14:22-15:2, 50:4-7. Lee responded that although he was keen on helping, Hedgpeth could be "hard to handle." <u>Id.</u> at 15:2-4, 50:7-9.

With that, Defendants had enough of their fruitless back and forth with the two old comrades. Rahim took out his handcuffs and told Hedgpeth that they were arresting him. <u>Id.</u> at 50:21-51:1. Once Plaintiff realized he was jail bound, he began yelling at the top of his lungs. <u>Id.</u> at 47:20-48:4, 52:19-53:7; <u>see</u> Rider Dep. at 95:1 (recounting that he was screaming at the sky "[l]ike the Hulk"). He howled the same three phrases again and again — "no"; "let me go"; "I didn't do anything" — perhaps laced with other profanities. <u>See</u> Lee Dep. at 53:5-7, 75:19-76:2; Rahim Dep. at 75:17-78:1. Some people in the vicinity began slowing down and paying attention. <u>See</u> Lee Dep. at 53:12-14. Next door at Marvin, Webb sat by the window, rubbernecking to watch the incident unfold. <u>See</u> Webb Dep. at 14:21-15:4.

Somewhere, something went awry. The record here is hazy, but however Hedgpeth ended up on the cement, it happened fast. <u>Id.</u> at 16:16-17 ("I looked away for one second and the next thing I know he's on the ground."); Rahim Dep. at 89:14-15 ("It happened so fast.").

To catch a breath, let's freeze the scene right before the incident and pause to look around. At this moment, a passerby with his head turned would see Hedgpeth still standing on

the sidewalk with his back facing the Den of Thieves. See Pre-Arrest Video; Rahim Dep. at 87:4-6. That establishment has a large, nearly floor-to-ceiling window as its storefront. See ECF No. 37, Exh. 1 (Incident Pictures) at 9-10. A matte-black metal grating covers the glass, creating a windowpane-like effect; the horizontal bars are roughly one-and-a-half feet apart, and the vertical bars are separated by about a foot. Near the ground — say, two feet above it — the glass stops. Below the glass, a short wall borders the bottom of the window forming a thin ledge, much like a picture frame. As for Rahim, a bystander would see him preparing to arrest Hedgpeth by approaching from behind. See Lee Dep. at 18:10-12.

What happened next is a toss-up. Various eyewitness accounts differ as to whether Hedgpeth was in motion. Perched at his window, Webb recalled how Plaintiff was either in the act of "lunging or wavering back and forth because he was intoxicated or maybe trying to escape talking to the police." Webb Dep. at 16:11-15. Lee recounted, however, that he never saw any lunging motions or attempts to flee. See Lee Dep. at 18:8-10, 36:15-17. Rahim corroborated that Plaintiff was not trying to flee and does not recall him lunging. See Rahim Dep. at 54:3-7, 73:14-74:15. Rider admitted to not paying much attention. His eyes were instead trained on Hedgpeth's driver's license while he attempted to take a picture of it. See Rider Dep. at 99:4-105:1. Contradicting his own officers' accounts, the police sergeant who later arrived on the scene recalled that the police duo informed him that Hedgpeth had tried to lunge at Rider. See ECF No. 39, Exh. 12 (Deposition of Stephen Keirn) at 59:11-13.

Also subject to debate are Plaintiff's hand gestures. Webb saw that, moments before Hedgpeth went down, "his fists were clenched." Webb Dep. at 16:15-16. Rahim likewise testified at length about how Plaintiff had clenched his fists with his fingers facing forward and

his arms pinned by his side. See Rahim Dep. at 67:16-70:15; Rider Dep. at 137:1-3, 138:12-15. Lee, however, begged to differ: Hedgpeth never did ball his fists up. See Lee Dep. at 36:9-14.

The flickering details of these few moments are no doubt lost. Although judges might be umpires, the record does not carry with it all the technological features of present-day multiple-angle instant replay. So let's unfreeze and march forward. After deciding to make an arrest, Rahim approached Plaintiff from behind and grabbed his left arm, preparing to handcuff his wrist. See Lee Dep. at 51:1-2. The officer repeatedly commanded Hedgpeth to surrender his other arm. Id. at 51:2-4. This went nowhere, as Hedgpeth refused. Id. at 51:4-7. Done with asking, Rahim then drove his knee forward and cut out Hedgpeth's legs from underneath him to take him down to the ground. Id. at 51:8-14, 58:19-59:3. In the process, Hedgpeth fell forward and spun to his left: His head flew into the window's grating or ledge, and he collapsed onto the cement sidewalk. Id. As this all unfolded, Lee texted his wife to explain that the police slammed Hedgpeth into the window after he refused to place his arms behind his back. Id. at 70:20-71:3. Later when asked, Lee clarified that Rahim initiated a "take-down maneuver" but that he did not think the officer specifically "meant for Jonathan to slam his head in to the side of the building." Id. at 21:16-18, 22:17-22.

The rest of the story is undisputed. Hedgpeth remained lying on the ground as the officers placed handcuffs on him. Id. at 52:8-10; Rahim Dep. at 90:9-11. The fall left a large gash over his left eye, and blood splattered all over the sidewalk. See Incident Pictures at 1-2, 6-8. Hedgpeth, unsurprisingly, continued to scream. See ECF No. 41 (Post-Arrest Video). Paramedics, who had been attending to the homeless man down the block, came and wrapped Plaintiff's head in gauze. See Rahim Dep. at 101:1-8. He was then taken to Howard University Hospital, where he was treated overnight and apparently received a number of stitches. See

Shiener Exam at 2; Zarwell Report, ¶ 4; Incident Pictures at 11.  The next morning, Hedgpeth

was transported to a courthouse cellblock, where he was detained.  See Shiener Exam at 2.  The

government sent him home that same day without bringing charges.  Id.

Defendants wrote the incident up as "Disorderly Affray."  See ECF No. 37, Exh. 6

(Metropolitan Police Department Report).  In a lengthier examination-request form submitted to

the hospital following the arrest, conversely, the officers noted that the charge was "SA/APO" —

i.e., simple assault and assault on a police officer.  See ECF No. 37, Exh. 7 (Request for

Examination) at 1.  That document also described: "Suspect fell into glass window as he was

being turned away from officer.  No use of force.  Suspect is heavily intoxicated."  Id. at 2.

Indeed, Rahim has since denied using any substantial amount of force.  He testified at a

deposition only that he "tried to grab [Hedgpeth's] shoulder or arm" to handcuff him, but that the

arrestee pulled away and fell on his own accord.  See Rahim Dep. at 82:2-21.  The officer admits

only to putting "part of [his] fingers" on Hedgpeth.  Id. at 83:22-85:12.

A month after the incident, a doctor's office at George Washington University examined

Plaintiff.  The doctor reported "recurrent headaches, vertigo after a concussion that is consistent

with post-concussive syndrome."  ECF No. 37, Exh. 2 (George Washington University Medical

Faculty Associates Report).  A much later psychiatric examination added "post-traumatic stress

disorder" to this list.  See Sheiner Exam at 6-7.

On July 30, 2015, Hedgpeth brought this suit against Rahim and Rider.  In his Complaint,

he lodged one cause of action under 42 U.S.C. § 1983, alleging violations of his Fourth and Fifth

Amendment rights.  See ECF No. 1 (Complaint), ¶¶ 32-43.  Namely, he claimed Defendants had

arrested him falsely and wielded excessive force in doing so.  His other two counts were brought

under state law — for assault and battery and, again, for false arrest.  Id., ¶¶ 44-52.

After the parties completed discovery, Rahim and Rider filed the present Motion for Summary Judgment, primarily seeking qualified immunity on Count One for their actions, which they contend were reasonable. That Motion is now ripe.

## II.    Legal Standard

The Court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence presented would permit a reasonable jury to return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895l; see also Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

As to the evidence available to the Court, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). That is, the nonmoving party may not merely make unsupported allegations or denials, but must instead rely on affidavits, declarations, or other competent evidence that set forth specific facts that point to the presence of a triable issue. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In viewing this record, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see Mastro

v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). The Court, in turn, must "eschew making credibility determinations" and avoid "weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

## III.   Analysis

As with most cases in which the police are sued for violating a plaintiff's constitutional rights, the foreground inquiry is whether the officers were acting reasonably under the law. Before delving into this analysis — known in the § 1983 context as qualified immunity — the Court first addresses some procedural disputes between the parties as to the record. After then finding qualified immunity warranted, it concludes by considering its supplemental jurisdiction over Plaintiff's state-law claims.

### A.   Procedural Disputes

With an amnesiac plaintiff, the record is messy enough. The parties, however, appear keen on dragging these summary-judgment proceedings into a morass of procedural complications. Indeed, Defendants devote roughly half of their Reply to objections that have little to do with the substance of Plaintiff's Opposition. See Reply at 3-7. The Court nonetheless addresses them.

To start, Rahim and Rider object that Hedgpeth failed to provide a statement of disputed facts that conforms with Local Rule 7(h) and that the statement he did submit often contains inaccuracies. As litigants before this Court should know, that Rule requires a party moving for summary judgment to file a "statement of material facts" that it contends are undisputed. See LCvR 7(h)(1). In similar fashion, when opposing that motion, the other side must submit a "concise statement" that sets forth "all material facts" that allegedly remain in dispute. Id. Both statements must include specific references to the record. Id. As contemplated by the Rule,

Defendants request that the Court treat their statement of facts as conceded as a sanction against Plaintiff for flouting the Rule's requirements.

Defendants are correct that Plaintiff is no poster child of compliance. In his Opposition, he informs the Court that he is "contesting every material fact." Opp. at 14 (all-bold emphasis omitted). Instead of specifying which facts remain in dispute, however, his short separate statement simply spews his own rendition of the facts, often hyperbolically. See, e.g., PSOF, ¶ 12 ("Rahim deliberately drove Jonathan face first into the metal grate and onto the ground."). In doing so, Hedgpeth has not helped the Court "crystallize . . . the material facts and relevant portions of the record," but has rather forced it to waste efforts "sift[ing] and sort[ing] through the record" itself. Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151, 153 (D.C. Cir. 1996).

Yet Defendants themselves ought to know that inhabitants of glass houses ought not throw stones. Rahim and Rider also provide a statement of (supposedly) undisputed material facts. Yet this statement so singularly relies on their depositions and presents such a biased perspective that it is no wonder Hedgpeth has chosen to contest everything. See, e.g., DSOF, ¶ 6 (labeling Hedgpeth as "barely intelligible"), ¶ 13 (describing how he was about to "attack"). To wit, Defendants did not even submit the relevant pages of Rider's deposition until this Court reminded them. See ECF No. 43.

Neither party can thus credibly state that its fact statement has been helpful for the purposes of summary judgment. This Court has had to "sift through hundreds of pages of depositions . . . in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." Lu v. Lezell, 45 F. Supp. 3d 86, 93 (D.D.C. 2014) (quoting

<u>Jackson</u>, 101 F.3d at 150).  Concluding that both sides should be censured, the Court will not take up Defendants' suggestion to direct its wrath toward Hedgpeth alone.

Next, Defendants seek to exclude two videos loaded on a DVD submitted with Plaintiff's Opposition.   Rahim and Rider object because Hedgpeth first attempted to file the videos *ex parte* and then asked for leave of the Court to file them.  <u>See</u> ECF Nos. 34, 35.  When those motions were denied — because no reason was given for an *ex parte* filing and no consent was sought for the leave motion as required by Local Rule 7(m) — Plaintiff nonetheless went ahead by submitting a Notice of Filing with the videos attached.  Yet Defendants have not shown what is so nefarious about this.  Indeed, it is what Hedgpeth should have done all along: Local Rule 5.4(e) permits a party to file a hard-copy DVD so long as it submits a Notice of Filing.

Moving on, Defendants last complain that because Plaintiff filed his Opposition four days late, "the Court may treat the motion as conceded."  <u>See</u> Local Rule 7(b).  Although this Rule might seem at first to vest this Court with discretion to turn the tides in the movant's favor, this Circuit has commented that even if the Court sanctions the non-movant for being tardy, the movant must still meet its burden to obtain summary judgment.  <u>See</u> <u>Cohen v. Bd. of Trs. of the Univ. of D.C.</u>, 819 F.3d 476, 482 (D.C. Cir. 2016).  That is, the best practice is to treat as conceded only the "uncontroverted <u>facts</u>" and then "examine the record on its own and determine that the moving party's assertions warrant summary judgment."  <u>See</u> <u>Grimes v. District of Columbia.</u>, 794 F.3d 83, 98 (D.C. Cir. 2015) (Griffith, J., concurring).  As mentioned, both sides' embellishments offer very few uncontroverted facts anyway, and so the Court, in its discretion, proceeds in the normal course to determine whether summary judgment is warranted.

B.  Section 1983 Claim (Count One)

Hedgpeth first seeks damages from Rahim and Rider for constitutional violations under

42 U.S.C. § 1983.  That statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress . . . .

Bundled up in Plaintiff's single § 1983 cause of action are essentially two alleged constitutional

violations: a Fourth Amendment false-arrest claim and a Fourth and Fifth Amendment excessive-

force claim.  He asserts, in short, that Rahim and Rider arrested him without probable cause and

then used unreasonable force in doing so.  See Complaint, ¶¶ 32-37.

In seeking summary judgment, Defendants plead that these claims should be rejected

under the doctrine of qualified immunity — "an entitlement not to stand trial under certain

circumstances." Mitchell v. Forsyth, 472 U.S. 511, 525 (1985).  For any alleged constitutional

violation, the immunity analysis proceeds in two parts.  First, "[t]aken in the light most favorable

to the party asserting the injury, do the facts alleged show the officer's conduct violated a

constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).  If so, the Court then asks

"whether [the] right is clearly established" — i.e., "whether it would be clear to a reasonable

officer that his conduct was unlawful in the situation he confronted." Id. at 202; Anderson v.

Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right.").  That is, "in the

light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640.  In

appealing to pre-existing law, the party asserting injury need not identify cases with "materially

similar" facts where violations have occurred but must only show that the state of the law when the incident occurred gave the officer fair warning of his conduct's unconstitutionality.  Johnson v. District of Columbia., 528 F.3d 969, 976 (D.C. Cir. 2008) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

This two-pronged qualified-immunity structure guides the Court's following discussion of Plaintiff's claims.  Although this Court may tackle the two immunity inquiries in any order, see Pearson v. Callahan, 555 U.S. 223, 236 (2009), no matter the sequence, "a defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the [constitutional violation] is so apparent that no reasonable officer could have believed in the lawfulness of his actions." Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 1993).  The Court addresses each claim — false arrest and excessive force — in turn, considering only the first immunity inquiry in the former and both in the latter.

1. *False Arrest*

Rahim and Rider first raise the banner of qualified immunity to combat Hedgpeth's claim that they violated the Fourth Amendment by falsely arresting him.  To show that no false-arrest violation occurred, "the defendant officers must establish probable cause to arrest." Id. at 1304; see Scott v. District of Columbia, 101 F.3d 748, 754 (D.C. Cir. 1996) (asking "whether the arresting officer had probable cause to believe that the arrestee committed a crime").  In other words, prior to an arrest, there must be a "fair probability" that a crime in fact happened. United States v. Jackson, 415 F.3d 88, 91 (D.C. Cir. 2005) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  The Court, in assessing probable cause, must examine "objectively . . . the facts and circumstances known to the officers at the time of the arrest without regard to the 'actual

motivations' or '[s]ubjective intentions' of the officers involved." United States v. Bookhardt, 277 F.3d 558, 565 (D.C. Cir. 2002) (quoting Whren v. United States, 517 U.S. 806, 813 (1996)). If the officers suffer defeat at this violation prong, they nonetheless may succeed if they can demonstrate that "their decision was reasonable, even if mistaken." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam). In this instance, the Court need not conduct the latter inquiry.

Hedgpeth, according to the police, was quite the rapscallion that night. Rahim and Rider identify no fewer than five crimes for which they could have lawfully arrested him: assault on a police officer, public intoxication, simple assault, disorderly conduct, and affray. The Court sets asides the first theory — which, in any event, relies on a shaky assumption that Plaintiff was poised to "attack" Rider — as the latter offenses suffice. See Mot. at 17.

As to the next offense — public intoxication — District law provides: "No person, whether in or on public or private property, shall be intoxicated and endanger the safety of himself, herself, or any other person or property." D.C. Code § 25-1001(c). Defendants allege, accordingly, that Plaintiff was an intoxicated person who was liable to endanger himself or others. See, e.g., Marshall v. D.C. Caribbean Carnival, Inc., No. 02-1298, 2004 WL 3257066, at *8 (D.D.C. Oct. 26, 2004) (finding probable cause for intoxication arrest where drunk person climbed aboard an eighteen-wheel truck during a parade).

Little dispute exists in the record over whether it was reasonable for the officers to believe that Hedgpeth was actually intoxicated. Concerned about his sobriety, they questioned him about it. See Lee Dep. at 14:17-20, 49:22-50:7. When he answered, his words were slurred. Id. at 44:18-20, 71:19-72:1, 75:6-12; Rider Dep. at 169:2-4. Although Lee professed his belief that his friend was just playing the part, this bare opinion matters not. Even if the officers were deceived as to Hedgpeth's drunkenness — they were not, as later medical records revealed his

staggering level of intoxication — it was still reasonable for police to confuse somebody pretending to be intoxicated with one who actually was. See Hunter, 502 U.S. at 229.

Plaintiff retorts that a reasonable juror could still conclude that Defendants lacked probable cause to believe that he was additionally a danger to himself or others. Not so. His friend, Lee, even told the policemen that Hedgpeth would be "hard to handle" if somebody tried to help him home. See Lee Dep. at 15:2-4, 50:7-9. A fair inference for an officer at the scene would thus be that if Hedgpeth was so drunk that even his friend could not get him home, then he truly was a safety concern, at least to himself. By all accounts, moreover, a reasonable officer could be concerned that Plaintiff was acting strangely: Lee thought Hedgpeth was for some reason acting drunk and faking it, see id. at 64:21-65:5, 68:13-69:2, 71:19-72:1, 72:15-73:8, and Plaintiff began yelling at the top of his lungs after told of the officers' intention to arrest him. Id. at 47:20-48:4, 52:19-53:7. Plaintiff, conversely, offers no reason why these officers should have reasonably believed that Hedgpeth would safely (for himself or anyone else) make it home.

Yet there's more. With simple assault, disorderly conduct, and affray, those theories all rest on another common set of facts — namely, that the officers saw Plaintiff shove a stranger, who then complained of it. To tick off these crimes, District law first prohibits "assault," which spans both physical attempts to cause injury and threatening conduct intended to injure or frighten. See Robinson v. United States, 506 A.2d 572, 574 (D.C. 1986); see D.C. Code § 22-404(a)(1). As to disorderly conduct, it similarly prohibits, "under circumstances whereby a breach of the peace may be occasioned, . . . interfere[nce] with any person in any pubic place by jostling against the person." D.C. Code § 22-1321. Finally, although the Court finds no published case where an individual has been charged under the present-day "affray" statute, that arcane-sounding offense appears to occur whenever two persons fight in public. Id. § 22-1301;

cf. <u>United States v. Herbert</u>, 26 F. Cas. 287, 289 (D.C. Crim. Ct. 1856) ("In the case of sudden affray, where parties fought on equal terms, that is, at the commencement or onset of the conflict, it matters not who gave the first blow.").

No creativity is required to understand how pushing strangers in public — which might also invite them to return the favor — could constitute criminal activity. In this case, Rahim and Rider testified that Hedgpeth shoved a tall black man on the street and that man then beseeched the officers for help. <u>See</u> Rahim Dep. at 46:2-49:11, 52:2-9, 52:21-53:5; Rider Dep. at 70:15-71:4. Even Lee, the witness most favorable to Plaintiff, admits that the officers approached them both, inquiring about somebody hitting people on that block. <u>See</u> Lee Dep. at 9:11-13, 10:16-18, 14:14-15, 49:15-17. It seems, then, that Hedgpeth's disorderly wrangling with others is uncontroverted.

 If only things were this easy. Plaintiff posits, as a plot twist, that the "tall black male" that he was seen to have pushed and Lee were in fact the same person. If this were so, the officers arguably would have lacked probable cause, as Lee explained to the police that Hedgpeth's punch was a friendly greeting, not a violent beating. At first blush, Plaintiff's theory appears farfetched. No evidence in the record even suggests that Lee is tall or black. While Hedgpeth mentions in his statement of facts — which, as discussed above, has problems — that "Marcus Lee is a tall black African American male," PSOF, ¶ 3, he cites nothing that would support this contention. That is, he points to no affidavit, deposition, or other document that suggests Lee and the stranger are the <u>same</u> black man.

Could a reasonable jury buy Plaintiff's theory? After all, the push against the stranger and the punch against Lee appear to have happened at roughly the same time in the narrative — that is, right before Hedgpeth began conversing with his old friend. Stranger still, Lee is

mentioned not once in Rahim's and Rider's depositions, even though he appears to have played a prominent part in that night's events — *e.g.*, he filmed them and the officers asked him to take Hedgpeth home. See Lee Dep. at 14:22-15:2, 50:4-7. Either the officers later thought Lee was a *fata morgana* or he and the stranger were one, Plaintiff argues, and the latter is more likely. Intriguing as this hypothetical may be, the Court must conclude that there is no genuine (*i.e.*, non-speculative) dispute of material fact that Hedgpeth punched or shoved the tall black man.

In sum, Defendants are entitled to qualified immunity on Plaintiff's false-arrest claim, as it was certainly reasonable for them to believe that probable cause existed to arrest for any of four criminal offenses — public intoxication, assault, disorderly conduct, or affray.

### 2. *Excessive Force*

The falsity of the arrest, of course, is not what actually caused most of Plaintiff's injuries. Hedgpeth thus accuses Rahim and Rider of violating the Fourth and Fifth Amendments by using excessive force in taking him down during the apprehension.

Before the Court proceeds with its qualified-immunity analysis, some claim cleanup is warranted. First off, Plaintiff only vaguely invokes the Fifth Amendment, alleging that "excessive force violated Hedgpeth's rights under the Fourth Amendment of the United States Constitution, as incorporated by the Fifth Amendment." Complaint, ¶ 36. Whatever "as incorporated" means here, the Supreme Court has made clear that where "the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment," and not the Fifth. Graham v. Connor, 490 U.S. 386, 394 (1989). Next, it is undisputed that only Rahim put his hands on Hedgpeth and that Rider used no force, let alone an unnecessary amount. See PSOF, ¶¶

12-15. The Court — jettisoning any claim under the Fifth Amendment or against Rider — homes in on the excessive-force claim against Rahim.

Law-enforcement officials run afoul of the Fourth Amendment's excessive-force prohibition when they use more force than is objectively "reasonable" to arrest a suspect. See Tennessee v. Garner, 471 U.S. 1, 7-8 (1985); Robinson v. District of Columbia, 130 F. Supp. 3d 180, 193 (D.D.C. 2015) ("[Plaintiff] must prove that the force used to carry out that seizure was objectively unreasonable."). In assessing reasonableness, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983). In Graham, the Supreme Court laid out several considerations that guide this inquiry: "[T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

Courts, however, must be wary of viewing the facts with the "20/20 vision of hindsight." Id. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a[n] [individual's] constitutional rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) (Friendly, J.). And even if a genuine issue exists as to whether force was indeed excessive, officers may still fall back on qualified immunity's second prong unless the "alleged use of excessive force violated a clearly established rule." Johnson, 528 F.3d at 976. The Court here considers both prongs.

### a. Violation of Fourth Amendment

Reasonableness here is a sticking point. Considering this case through the Graham factors, Rahim starts off at a disadvantage. To begin, whatever Defendants suspected Plaintiff of, it was a minor offense. Simple assault, disorderly conduct, affray, and public intoxication are

misdemeanors that each carry a maximum imprisonment term of no more than 180 days. <u>See</u> D.C. Code §§ 22-404, 22-1301, 22-1321, 25-1001. And to the extent that Hedgpeth pushed a stranger — the most damning conduct — it appears doubtful that he injured anything more than that person's pride. Indeed, the officers initially did not even want to arrest Hedgpeth, as they were seemingly content to let him go home with Lee. <u>See</u> Lee Dep. at 14:22-15:2, 50:4-7.

To pile it on, the parties agree that Plaintiff did not attempt to flee, and whether he made any threatening movements (<u>e.g.</u>, lunging, clenching fists) is contested with deposition testimony going both ways. The only <u>Graham</u> consideration remaining is whether Hedgpeth "resisted." Although this Circuit had held, relatedly, that merely being "loquacious" and "cr[ying]" would not usually constitute "resist[ing] arrest or tr[ying] to free [one]self from the policemen's grip," <u>DeGraff v. District of Columbia</u>, 120 F.3d 298, 302 (D.C. Cir. 1997), Hedgpeth did more. Beyond being loquacious, he refused to comply with an officer's directions to provide his arm for the arrest and screamed at the top of his lungs. Even handing this factor to Rahim, however, it would seem that the circumstances generally disfavored his use of a takedown.

This is not to say that Rahim could not have used <u>some</u> force. The officers had a legitimate interest in arresting Hedgpeth. <u>See</u> <u>Kyle v. Bedlion</u>, No. 12-1572, 2016 WL 1301043, at *8 (D.D.C. Apr. 1, 2016). Beginning with that presumption, the act of placing somebody under arrest — <u>e.g.</u>, holding his arms behind the back, handcuffing him — necessarily involves force, sometimes force that is more than minimal. The facts here bear out that truth. As mentioned, the officers suspected Hedgpeth to be drunk, and he was screaming, declining to answer simple questions, and refusing to provide his right arm to make the arrest easier when commanded by Rahim. <u>See</u> Lee Dep. at 51:1-7. At this point, the officers also knew from Lee that Hedgpeth could be "hard to handle." <u>Id.</u> at 15:2-4, 50:7-9. With bystanders now slowing to

watch, Rahim had a decision.  Id. at 53:12-14;  see Wardlaw, 1 F.3d at 1302 ("Law enforcement officers are routinely required to make split second decisions . . . .").  How much force should he use to make the arrest?

At least one eyewitness points to Rahim's resorting to a takedown maneuver by jamming his knee behind Hedgpeth's leg.  See Lee Dep. at 51:8-14, 58:19-59:3.  Yet for Rahim, there certainly were measures less forceful than that.  He could have tried to reach for Plaintiff's other arm or asked Rider to assist in doing so.  Neither of the officers offers any explanation as to why these options were not taken.  Rahim instead holds fast that he only grazed the arrestee with his fingers, see Rahim Dep. at 83:22-85:12, testimony a juror could easily discredit.  Reasonableness, therefore, is a close question.  This Court need not decide it, however, as the cases below show that Defendants' conduct did not violate any clearly established law.

b.  Clearly Established Rights

The next question ultimately hinges on whether this takedown "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In other words, the Court must look to "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202 (emphasis added); see Johnson, 528 F.3d at 975 ("It will not do to ask whether [Plaintiff] had a right to be secure in his person against unreasonable seizures.").  Here, the relevant inquiry is whether a reasonable officer should know that it was unlawful to resort to a takedown maneuver to arrest a person who was loud, drunk, and potentially hard to handle, and who did not comply with the arresting officer's orders.

The law is not so clear.  First, what is certain is that the D.C. Circuit has held several times that gratuitous violence is clearly unconstitutional.  In Johnson v. District of Columbia, the Circuit confronted a situation where officers kicked an individual in the groin repeatedly after he

had fallen to the ground and surrendered.  See 528 F.3d at 975-76.  That case was easy: no

qualified immunity.  In another suit for mental and emotional injuries, the Circuit likewise found

that it was unreasonable for police to lift a compliant and already-bound individual above their

heads and then carry her to a mailbox to handcuff her to it.  DeGraff, 120 F.3d at 302.  As these

cases clearly establish: "[T]he state may not perpetrate violence for its own sake.  Force without

reason is unreasonable."  Johnson, 528 F.3d at 977.

Yet these are cases where the arrestee was totally compliant — even prostrate — and law-

enforcement officials exercised more than some minimal quantum of force.  When an individual

does not comply with an arresting officer's commands, the officer has authority to use "some

degree of physical coercion."  Graham, 490 U.S. at 396.  For instance, where an individual

refused an officer's command to stop dancing about the Jefferson Memorial, the officer

reasonably "pulled her arm behind her back and pushed her up against a stone column during her

arrest."  Oberwetter v. Hilliard,  639 F.3d 545, 555 (D.C. Cir. 2011).

Add in indicia of the suspect's aggression or intoxication and the authorization to use

force broadens.  The facts of Scott v. District of Columbia may thus sound familiar.  In that case,

the plaintiff, Scott, was "erratic and belligerent" and appeared to be intoxicated.  See 101 F.3d at

751.  Police first placed him into a cruiser, but he became disoriented and exited when the car

stopped at a corner.  Id. at 752.  Scott immediately offered to reenter the vehicle, but the police

had none of it; instead, one officer threw a punch and others "then knocked him to the ground,

rolled him over, and pinned him with their knees so that he could be handcuffed."  Id. at 759.

The Circuit, however, concluded that this series of actions — far more violent than here — was

reasonable.  Although the case was no doubt colored by the possibility of Scott's leaving the

cruiser to escape (which he assured was not so), also central to the court's analysis was his earlier "erratic behavior" – *e.g.*, cursing at an officer, appearing drunk. Id. at 751, 759.

In similar fashion, out-of-circuit cases demonstrate that when a suspect is noncompliant and intoxicated or confrontational, officers have wider latitude when making their arrests. See, e.g., Cook v. Peters, 604 F. App'x 663, 668 (10th Cir. 2015) (approving takedowns in line of cases where arrestees "were intoxicated or physically threatening"). The Tenth Circuit, for instance, found significant in a takedown case that the suspect was acting "strange" by adopting a crouched stance and had been "yelling . . . , appeared very angry[,] . . . [and] smelled as if he had been drinking." Gallego v. City of Colo. Springs, 114 F.3d 1024, 1031 (10th Cir. 1997).

Perhaps more starkly, the Sixth Circuit has approved a straight-arm-bar takedown where the individual was neither verbally nor physically confrontational but nonetheless appeared to have been drinking and failed to comply with an order to place his arms behind his back. See Bozung v. Rawson, 439 F. App'x 513, 520 (6th Cir. 2011) (recognizing plaintiff was generally "cooperative and was not boisterous, combative, or disrespectful"). In that case, the officers' only effort to arrest the suspect peaceably was to warn him that they could do this "the easy way or the hard way." Id. at 515. In contrast, Rahim and Rider from the start sought to help Hedgpeth find his way home without an arrest. And Rahim, prior to the takedown, first grabbed only one arm and then — despite Plaintiff's screaming — gave him multiple opportunities to offer up his second.

Beyond takedown cases, decisions involving tasers can be informative. A shock by a taser, like a physical takedown, also causes a suspect to lose control of his body and collapse to the ground. Yet the Eighth Circuit, for example, has held that taser use was reasonable where the suspect was refusing to abide by police orders, expressing sarcastic comments, and "hysterically

shouting." <u>Cook v. City of Bella Villa</u>, 582 F.3d 840, 850 (8th Cir. 2009).  The Eleventh Circuit

held the same in a case where the individual "used profanity, moved around and paced in

agitation, . . . repeatedly yelled at [the officer,] . . . [and] repeatedly refused to comply with [the

officer's] verbal commands." <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1278 (11th Cir. 2004).  In

these scenarios, where a suspect appears "hostile, belligerent, and uncooperative," some greater

physical force "might be preferable to a physical struggle causing serious harm to the suspect or

the officer." <u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1290 (11th Cir. 2011) (alterations, quotation

marks, and citation omitted).

Taking down a suspect — physically, via taser, or otherwise — thus assists in the arrest

and dampens the risk of a physical struggle.  Understanding the law as set out by these cases, a

reasonable police officer in <u>this</u> case would not have believed that a physical takedown would be

clearly unlawful.  A common factual strain runs through each case where increased force is

approved: an arrest of a noncompliant and bellicose (and often drunk) suspect.  Those factors

were present here, as Hedgpeth refused to provide his arm for the arrest, yelled, and acted drunk.

In somewhat similar situations, force arguably greater than what was used against Hedgpeth has

been authorized.  <u>See</u> <u>Scott</u>, 101 F.3d at 759 (punching suspect and then knocking him down).

Yet the officers here even had another reason to wield preemptive force — <i>viz.</i>, they heard from

Plaintiff's acquaintance that he could be difficult to handle.  <u>See</u> Lee Dep. at 15:2-4, 50:7-9.

Plaintiff rejoins that this was not a simple takedown but rather a slamming of his head

into a grate.  And, indeed, where an officer intentionally drives a person's head or body into, say,

a wall or window, then the use of force might well be deemed manifestly unreasonable.  <u>See</u>

<u>Scarbro v. New Hanover Cty.</u>, 374 F. App'x 366, 370 (4th Cir. 2010) (acknowledging force

would be unreasonable if it were applied in a "malicious, wanton, or sadistic manner").  Put

somewhat differently, the act of directing vulnerable body parts into hazardous objects would clearly be violence for violence's sake. This case, however, does not reflect that situation because Plaintiff's characterization of the incident finds no support in the record. Rahim says that Hedgpeth twisted away and lost his balance before striking his head. See Rahim Dep. at 82:2-21. And the only witness who believed that Rahim took Hedgpeth down specified that he did not think the officer "meant for Jonathan to slam his head in to the side of the building." Lee Dep. at 21:16-18, 22:17-22. There is thus no actual evidence that the injury was anything other than an accidental byproduct of the takedown.

Shifting his argument from facts to law, Plaintiff lists a number of appellate cases from other circuits where takedowns have been found to violate clearly established law. In none of those cases, however, were the arrestees loud, belligerent, or drunk; instead, they were substantially compliant. See, e.g., Morris v. Noe, 672 F.3d 1185, 1190 (10th Cir. 2012) (where situation was "calm and under control" and individual "put his hands up"); Meirthew v. Amore, 417 F. App'x 494, 498 (6th Cir. 2011) (where suspect was already handcuffed at police station and "resistance was minimal" in the form of not spreading feet when searched); Holmes v. Vill. of Hoffman Estate, 511 F.3d 673, 686 (7th Cir. 2007) (where arrestee "never resisted the officers and was cooperative"). One of the decisions he cites even seems to weigh against his case, given that these officers suspected him of assault: "A forceful takedown or 'throw down' may very well be appropriate in arrests or detentions for assault." Morris, 672 F.3d at 1195 (finding it also appropriate to assume "the arrest or the detention [for assault] w[as] warranted") (emphases, quotation marks, and citation omitted).

That the law does not favor Hedgpeth here does not detract from the fact that Rahim's takedown was unfortunate and may well have resulted in serious injury. A reasonable officer

faced with a similar situation may — in some cases, more prudently — first resort to less violent means, such as calling for assistance or effecting the arrest without a takedown.  While the existence of less forceful options is relevant, no clearly established law requires officers to use the "least intrusive degree of force possible."  Marquez v. City of Phoenix, 693 F.3d 1167, 1174 (9th Cir. 2012) (quoting Forrester v. City of San Diego, 25 F.3d 804, 807-08 (9th Cir. 1994)).  What matters is what the officer did — a simple takedown maneuver — not what necessarily resulted — a bloody head injury.  See Scarbro, 374 F. App'x at 370 ("During the takedown, the mats covering the floor apparently shifted, allowing [the plaintiff's] head to hit the concrete floor.  However, this is not evidence that [the officer's] purpose was malicious, sadistic or wanton.").  As all witnesses agree, Rahim did not attempt to inflict this fate upon Hedgpeth.  See Lee Dep. at 51:8-14, 58:19-59:3;  Rahim Dep. at 82:2-21, 83:22-85:12.  Because the Court cannot say that a reasonable officer would have realized a takedown maneuver in these circumstances violated clearly established law, Rahim is entitled to qualified immunity.

    C.  State-Law Claims (Counts Two & Three)

      With that, Plaintiff is left only with two state common-law claims for assault and battery and for false arrest.  Although Defendants do not ask for dismissal of those claims on jurisdictional grounds, the Court lacks independent subject-matter jurisdiction over them and will decline to exercise supplemental jurisdiction.  See Art & Drama Therapy Inst., Inc. v. District of Columbia, 110 F. Supp. 3d 162, 176 (D.D.C. 2015) ("It is well settled that the court may decline to exercise supplemental jurisdiction *sua sponte* when the plaintiff's predicate federal law claims have been dismissed and there are no alternative means of establishing jurisdiction.") (citing 28 U.S.C. § 1367(c)(3)).

Federal district courts are given supplemental (or "pendent") jurisdiction over state claims that "form part of the same case or controversy" as federal claims over which they have original jurisdiction.   See 28 U.S.C. § 1367(a).  By the same token, they "may decline to exercise supplemental jurisdiction over [such] claim[s] . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."   28 U.S.C. § 1367(c)(3).   The decision of whether to exercise supplemental jurisdiction where a court has dismissed all federal claims is left to the court's discretion as "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); see Shekoyan v. Sibley Int'l, 409 F.3d 414, 423 (D.C. Cir. 2005).  When deciding whether to exercise supplemental jurisdiction over state claims, federal courts should consider "judicial economy, convenience, fairness, and comity."  Shekoyan, 409 F.3d at 424.  When all federal claims are eliminated before trial, however, "the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); see Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1267 (D.C. Cir. 1995) (finding discretion set out in Carnegie-Mellon Univ., 484 U.S. 343, "unaffected by the subsequent enactment of 28 U.S.C. § 1367(d), in the Judicial Improvements Act of 1990").

Here, the factors weigh against retention of the case.  Although the suit has reached the summary-judgment stage, the parties have not substantially briefed the assault and battery under D.C. law and the Court has developed no particular familiarity with the state-law issues present here.  Cf. Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 378-79 (D.C. Cir. 2010) (finding district court appropriately retained pendent jurisdiction over state claims where it had

"invested time and resources"). The Court can thus conceive of no undue inconvenience or unfairness to the litigants that would result from a decision not to exercise supplemental jurisdiction over the remaining claims. Finally, Plaintiff will not be prejudiced because 28 U.S.C. § 1367(d) provides for a tolling of the statute of limitations during the period the case was here and for at least 30 days thereafter. See Shekoyan, 409 F.3d at 419 (affirming district court finding that, because of tolling, dismissal of pendent state claims "will not adversely impact plaintiff's ability to pursue his District of Columbia claims in the local court system") (citation omitted).

## IV.   Conclusion

For these reasons, the Court will grant Defendants' Motion for Summary Judgment. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  October 3, 2016